UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TOMMY HALL,

    Plaintiff,                CIVIL ACTION NO. 09-10933

    v.                          DISTRICT JUDGE DAVID M. LAWSON

RAJA, JAYNA SHARPLEY,        MAGISTRATE JUDGE MARK A. RANDON
CORRECTIONAL MEDICAL
SERVICES, INC., and PRISON
HEALTH SERVICES, INC.,

    Defendants.
_____/

**REPORT AND RECOMMENDATION TO GRANT
CORRECTIONAL MEDICAL SERVICES, INC.'S
MOTION FOR SUMMARY JUDGMENT (DKT. NO. 134)**

**I.    BACKGROUND AND PROCEDURAL HISTORY**

Plaintiff, a former Michigan prisoner, brought this civil rights claim under 42 U.S.C. § 1983 against several prison healthcare officials and two corporate medical service providers. (Dkt. No. 64). Plaintiff alleges he has a congenital birth defect that results in his spinal cord narrowing and that two surgeries have been performed to relieve nerve compression: one on April 27, 2000, and the second, a spinal-fusion surgery, on April 23, 2008, which was performed outside of prison. (Dkt. No. 64 at 4). Plaintiff states that, when he returned to prison on August 14, 2008, he was removed from all medications, which caused intense pain; he repeatedly requested follow-up medical care including pain medication and physical therapy, but his requests were continually denied or ignored. (Dkt. No. 64 at 5). Defendant Correctional Medical

Services, Inc. ("CMS") was the medical provider for prisons in the State of Michigan until April 1, 2009, after which co-Defendant Prison Health Services, Inc. became the medical provider. (Dkt. No. 64 at 4).

During the time Plaintiff was incarcerated, his pain condition was severe enough to warrant three emergency trips to Allegiance Hospital where he was given Morphine and Dilaudid for pain. (Dkt. No. 64 at 5). Plaintiff alleges that, after returning to prison, these pain medications were discontinued. Beginning in December 2008 or January 2009, Plaintiff was prescribed Ultram for his pain. (Dkt. No. 64 at 5-6). According to Plaintiff, he has suffered "intense pain, and continues to suffer, from lack of adequate pain medication and the lack of appropriate medical care." (Dkt. No. 64 at 6).

In Count Two of Plaintiff's Complaint, he alleges that his constitutional rights were violated through various policies, practices, or procedures that were admittedly implemented by either the Michigan Department of Corrections ("MDOC") or the Medical Service Advisory Committee ("MSAC") but which CMS "adopted formally or by practice and custom." (Dkt. No. 64 at 12-13). Count Two also alleges that "employees of CMS including the pain management committee members are the people responsible for the cruel and inhuman treatment [of Plaintiff] and deliberate indifference . . . and that CMS is responsible for their[sic] actions due to the alleged policies, practices, and customs." (Dkt. No. 64 at 15).

Count Three of Plaintiff's Complaint sets forth various allegations of alleged wrongdoing against co-Defendant Dr. Thyagarajan, for which he seeks to hold CMS liable. (Dkt. No. 64 at 17-21). Count Three was dismissed; CMS cannot be held liable under a theory of vicarious liability. (Dkt. Nos. 116 and 150).

Before the Court is CMS's Motion for Summary Judgment. (Dkt. No. 134). CMS asks the Court to dismiss count two. Plaintiff responded on February 7, 2012. (Dkt. No. 144). CMS filed a Reply on February 24, 2012. (Dkt. No. 148).

For the following reasons, this Magistrate Judge **RECOMMENDS** that CMS's motion be **GRANTED**, and that Count Two – the only remaining count against CMS – be **DISMISSED WITH PREJUDICE**.

II.   **STANDARD OF REVIEW**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). On a motion for summary judgment, the Court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Eward*, 241 F.3d 530, 531 (6th Cir. 2001).

The moving party has the initial burden of demonstrating an absence of evidence to support the non-moving party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party carries this burden, the party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587. The Court must determine whether the evidence presents a sufficient factual disagreement to require submission of the challenged claims to a jury or whether the evidence is so one-sided that the moving party must prevail as a matter of law. *See Anderson*, 477 U.S. at 252 ("The mere

existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff").

**III. ANALYSIS**

It is well established that an inmate has a cause of action under 42 U.S.C. § 1983 against prison officials for "deliberate indifference" to his serious medical needs, since the same constitutes cruel and unusual punishment proscribed by the Eighth Amendment. *See Estelle v. Gamble*, 429 U.S. 97 (1976). Under *Monell*, in order to establish a § 1983 claim against a corporation, Plaintiff must allege that he suffered deliberate indifference due to a policy, practice, or custom of CMS. *See Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 690 (1978); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 818 (6th Cir. 1996) (extending the holding in *Monell* to private corporations). A claim relying on the doctrine of respondeat superior will not lie. *See Monell*, 436 US at 691. In order to satisfy the requirements set forth in *Monell*, Plaintiff must "identify the policy, connect the policy to the [corporation] itself and show that the particular injury was incurred because of the execution of that policy." *Coogan v. City of Wixom*, 820 F.2d 170, 176 (6th Cir. 1987).

Plaintiff's Complaint alleges he suffered deliberate indifference due to six of CMS's policies, practices, or customs. Plaintiff claims CMS has a custom, practice, or policy to: (1) not follow MDOC Policy Directive 03.04.100(R)-(W); (2) not follow MSAC Guideline 0021; (3) restrict air mattresses to inmates with skin conditions; (4) terminate all pain medication immediately upon admission to the Reception and Guidance Center ("RGC"); (5) not pay special attention to inmates who, on admission, have recently had major surgery, or immediately consult the outside surgeon for information and guidance for that inmate's health care; and (6) not handle

medical matters that are beyond the scope of available institutional services. (Dkt. No. 64 at 12-14).

However, in Plaintiff's Response, he narrows his argument down to two policies. *See* Dkt. No. 144 at 7-8:

> All of the policies alleged in the amended complaint are important, but, for the express purpose of this motion, the focus is on two. First, the practice to take all medications from a prisoner on arrival to RGC and defer the implementation of a treatment plan until assignment at a facility. And, second, the policy that a [medical service provider ("MSP")], here that is Dr. Thyagarajan, cannot implement his own plan to provide pain medication but must adhere to the decision of the pain management committee. The proximate result from these two unconstitutional policies and practices is the cruel and inhuman pain suffered by the plaintiff who had recently undergone serious surgery and needed immediate and effective pain medications.

This Magistrate Judge previously issued a Report and Recommendation ("R&R") denying CMS's Motion to Dismiss count two, but indicated that Plaintiff would have to use the discovery process to prove his allegations against CMS. (Dkt. No. 116 at 10). The R&R was adopted by Judge David M. Lawson on March 27, 2012. (Dkt. No. 150).

      **A.**      **Plaintiff's Claim that CMS has a Custom, Practice, or Policy to Take All Medications from a Prisoner on Arrival to the RGC**

Plaintiff argues that CMS has a custom, practice, or policy to take all medications from a prisoner on arrival to the RGC. According to Plaintiff, this custom, practice, or policy does not follow MDOC Policy Directive 03.04.100(R)-(W) nor does it provide prisoners adequate health services on arrival to the RGC.

The relevant portions of MDOC Policy Directive 03.04.100(R)-(W) provide:

(R)      The prisoner health record shall be established as soon as possible after the prisoner's arrival at a reception facility as set forth in PD 03.04.108 "Prisoner Health Information". Each prisoner received at a reception

        facility shall be provided a health screening and full health appraisal as set forth below[.]

(S) The following shall be provided to each prisoner as soon as possible but no later than eight hours after arrival at a reception facility:

    1. A preliminary health screening, including recording height, weight and vital signs, and arrangements for any needed medical treatment, including medicine renewals and detoxification.

(T) The following shall be completed for each prisoner within 14 calendar days after arrival at a reception facility:

    1. A comprehensive history and physical examination by an MSP, unless documented in the prisoner's health record that one was completed within the preceding year.

    2. A comprehensive health appraisal by an appropriate QHP, unless documented in the prisoner's health record that one was completed within the preceding 90 calendar days. This shall include the following:

        a. Reviewing preliminary health screening conducted pursuant to Paragraph S[.]

        b. All necessary lab tests.

        c. Appropriate diagnostic procedures and treatment.

        d. Any necessary immunizations.

(U) The following also shall be completed for each prisoner within 14 calendar days after arrival at a reception facility, unless otherwise determined by the BHCS Administrator or designee:

    . . .

    4. Referral to QHP specific to identified prisoner needs.

    . . .

 (W) Prisoners shall be screened for placement and, if appropriate, enrolled in a chronic care clinic. Baseline laboratory studies for prisoners to be placed in the clinic shall be initiated in the reception facility.

(Dkt. No. 144; Ex. B, Policy Directive 03.04.100).

  On August 14, 2008 – the date Plaintiff arrived at the RGC – nurse Greg C. Sottek asked Plaintiff the following questions: (1) "[d]o you currently have any injuries, pain, or illness requiring medical attention?"; (2) "[a]re you currently under a physician's care?"; (3) "[h]ave you been treated for any illnesses or injuries in the past two months?"; (4) "[h]ave you been hospitalized recently?"; (5) "[a]re you currently experiencing . . . Nausea, Vomiting, Abdominal Pain, Chest Pain, Shortness of Breath, Diarrhea/Dehydration, Blood in urine, Recent weight changes, Weakness/Lethargy, Cough, Recurrent fever, Night sweats, Chills, Fatigue?"; (6) "[d]o you have, or have you ever had . . . Asthma/Emphysema, Chronic GI Trouble, Heart Trouble, High Blood Pressure, Bleeding, Kidney/Bladder Trouble, Diabetes, Disability Epilepsy/Seizures, Cancer?"; (7) "[a]re you now or have you ever been treated for . . . Tuberculosis, Hepatits/Jundice, Syphilis, Gonorrhea, AIDS, Herpes, Lice/Crabs?"; (8) "[h]ave you ever been hospitalized for psychiatric reasons?"; (9) "[h]ave you recently used drugs . . . with a moderate to heavy usage?"; (10) "[h]ave you ever used IV drugs?"; (11) "[d]o you have any prosthetic devices?"; (12) "[d]o you have any allergies?"; and (13) "[a]re you taking any medications?" (Dkt. No. 135; Ex. C, Exceptions of MDOC Medical Records Pertaining to Tommy Hall at 1-2).

  In addition, nurse Sottek: (1) took Plaintiff's vitals, height, and weight; (2) scheduled follow-up appointments; (3) provided Plaintiff with a medication and information pack; and (4) explained the kite system. (Dkt. No. 135; Ex. C at 2-3).

Further, on August 14, 2008, Dr. Kenya S. Everette ordered the following medications for Plaintiff: (1) Amitriptyline[1]; (2) Tenormin (Atenolol)[2]; and (3) Zantac (Ranitidine)[3]. (Dkt. No. 135; Ex. C at 4).

On August 15, 2008, Mark A. Boomershine, PA determined if Plaintiff had difficulty with his eyes, ears, nose, throat, and mouth. He also asked Plaintiff if he had psychiatric, pulmonary, cardiovascular, circulatory, gastrointestinal, genitourinary, endocrine, skin, neurological, or muscouloskeletal problems. (Dkt. No. 135; Ex. C at 5). Finally, Mr. Boomershine performed a behavioral assessment; took Plaintiff's vitals, height, weight, and body mass index; determined if he was a smoker; noted Plaintiff's general appearance; and examined Plaintiff's head/neck, eyes, ears, nose/mouth/throat, skin, respiratory system, cardiovascular system, musculoskeletal, neurological, lymphatic, abdominal, genitalia, and proctological. (Dkt. No. 135; Ex. C at 5-10). Mr. Boomershine noted that Plaintiff's "physical exam fails to confirm the degree of disability he mentions due to his chronic pain." (Dkt. No. 135; Ex. C at 11). Mr. Boomershine ordered Salsalate[4] for Plaintiff. (Dkt. No. 135; Ex. C at 12).

---

[1] "Amitriptyline" is a medication used to treat symptoms of depression, as well as to prevent migraine headaches. "Amitriptyline," PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000666 (last visited July 13, 2012).

[2] "Atenolol" is a medication used to treat hypertension. "Atenolol in Hypertension: is it a wise choice?," PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0021295 (last visited July 13, 2012).

[3] "Zantac" is the brand name of a medication called Ranitidine, which is used to treat ulcers, GERD, upper gastrointestinal bleeding. "Ranitidine," PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000094 (last visited July 13, 2012).

[4] "Salsalate" is a medication used to relieve pain caused by rheumatoid arthritis and osteoarthritis. "Salsalate," PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000803 (last visited July 13, 2012).

Dr. Joshua Nnanji ordered Zoloft (Sertraline)[5] and Risperdal (Risperidone)[6] for Plaintiff on August 15, 2008. (Dkt. No. 135; Ex. C at 14).

While Plaintiff complains that he needed stronger medication than what was prescribed, he did receive medications and some medical treatment when he arrived at the RGC, and "the general principle of disfavoring judicial second guessing of the medical treatment provided applies unless the treatment was 'so cursory as to amount to no treatment at all' or was 'grossly inadequate.'" *Bemer v. Corr. Med. Services, Inc.*, 2012 WL 525564 at *8 (E.D. Mich. Jan. 27, 2012) (citations omitted). "Grossly inadequate medical care is that which is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Id.* This Magistrate Judge finds that Plaintiff's medical treatment was neither cursory nor grossly inadequate as a matter of law.

The treatment Plaintiff received upon his arrival to the RGC also complied with MDOC Policy Directive 03.04.100(R)-(W). The MSPs prescribed Plaintiff medication they determined he needed based on their questioning and examination of Plaintiff. Again, "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976).

---

[5] "Zoloft" is the brand name of the medication Sertraline, which is used to treat depression and other mental health disorders. "Sertaline," PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001017 (last visited July 13, 2012).

[6] "Risperdal" is the brand name of the medication Risperidone, which is used to treat Schizophrenia. "Risperidone dose for schizophrenia," PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0014477 (last visited July 13, 2012).

Further, even if Plaintiff could establish that his medication was taken from him upon his arrival to the RGC, this Magistrate Judge finds a jury could not reasonably infer that this meant CMS had a "widespread, permanent, and well-settled custom" of denying inmates adequate medical treatment. *See Jones v. Muskegon County*, 625 F.3d 935, 946 (6th Cir. 2010).

> **B.** **Plaintiff's Claim that CMS has a Custom, Practice, or Policy that a Medical Service Provider Cannot Implement His Own Plan to Provide Pain Medication but Must Adhere to the Decision of the Pain Management Committee**

Plaintiff next argues that CMS's custom, practice, or policy that requires a MSP to refer chronic pain patients to the Pain Management Committee ("PMC") instead of allowing a MSP to implement his own plan to provide pain medication, is a violation of the constitution. According to Plaintiff, a primary care physician must be allowed to treat a patient according to his own judgment.

It is the MDOC's policy – not that of CMS – that all chronic pain patients be referred to the PMC for the development of an individualized pain management plan. *See* Dkt. No. 134; Ex. D, Declaration of Dr. Vishnampet Thyagarajan. As Plaintiff points out, MDOC Policy Directive 03.04.100(K) simply requires CMS to follow all MDOC Policy Directives. (Dkt. No. 144 at 7; Dkt. No. 144; Ex. B, MDOC Policy Directive 03.04.100 at 2). However, CMS may be held liable under *Monell*, if Plaintiff can connect the MDOC policy to CMS. *See Coogan*, 820 F.2d at 176.

Plaintiff presents a portion of the CMS/MDOC contract (Dkt. No. 144; Ex. C, Pages from CMS/MDOC contract) to support his argument that CMS "adopted [MDOC's policies] formally

or by practice and custom." (Dkt. No. 64 at 12-13). Specifically, Plaintiff relies on the following excerpts from the CMS/MDOC contract:

> [CMS] will be solely and entirely responsible for its acts and the acts of its agents, employees, servants and subcontractors during the performance of this Contract.
>
> CMS shall assure that the entity responsible for [medically necessary health care for prisoners in Camps, SAI, and TRVs] works cooperatively to provide prisoners with necessary care that is timely, efficient, effective, and of the same quality as that provided to the general public.
>
> [Ambulatory Care must] [c]ompl[y] with the recommendations of the MDOC Pain Committee on use of narcotics for chronic pain patients[.]
>
> [MSPs must] [o]rder medically appropriate medication through the appropriate MDOC process.

(Dkt. No. 144; Ex. C at 1, 4, 6, and 10). This Magistrate Judge finds that none of these provisions prove that CMS "adopted" the MDOC policy as its own. Instead, these provisions are further proof that CMS was simply required to follow all MDOC Policy Directives.

Accordingly, Plaintiff failed to connect the MDOC policy to CMS, and CMS is entitled to summary judgment.

## IV. CONCLUSION

For the reasons stated above, this Magistrate Judge **RECOMMENDS** that CMS's motion be **GRANTED**, and that Count Two – the only remaining count against CMS – be **DISMISSED WITH PREJUDICE**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140

(1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

    Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court. The response shall address each issue contained within the objections specifically and in the same order raised.

                                  s/Mark A. Randon
                                  MARK A. RANDON
                                  UNITED STATES MAGISTRATE JUDGE
Dated: July 31, 2012

### Certificate of Service

*I hereby certify that a copy of the foregoing document was served on the parties of record on this date, July 31, 2012, by electronic and/or first class U.S. mail.*

                                  *s/Melody R. Miles*
                                  *Case Manager to Magistrate Judge Mark A. Randon*